**ALANA L. MCMAINS**
California State Bar No. 285942
**MCMAINS LAW, APC**
185 West F St. #100-R
San Diego, California 92101
Telephone: (619) 310-5421
alana@mcmainslaw.com

Attorney for Plaintiff S.O.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.O., an individual,<br><br>                    Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA (FEDERAL BUREAU OF PRISONS); LAWRENCE GACAD; and DOES 1 through 10, inclusive;<br><br>                    Defendants. | Case No.:  4:26-cv-2298<br><br>**COMPLAINT FOR:**<br>  1. **Eighth Amendment Violation;**<br>  2. **Gender Violence;**<br>  3. **Sexual Battery;**<br>  4. **Intentional Infliction of Emotional Distress;**<br>  5. **Battery;**<br>  6. **Negligence;**<br>  7. **Bane Act;**<br>  8. **Trafficking Victims Protection Act; and**<br>  9. **California Trafficking Victims Protection Act**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.    This action stems out of Plaintiff S.O.'s repeated sexual harassment and abuse at the hands of those entrusted with her care when she was in custody at the Federal Correctional Institution Dublin ("FCI Dublin"), an all-female prison owned and operated by Defendant the UNITED STATES OF AMERICA ("the UNITED STATES") via its agency the Federal Bureau of Prisons ("BOP").

2.    When she began her sentence, Plaintiff had no idea she was entering an environment so rampant with sexual abuse and corruption that guards and prisoners alike had nicknamed it "the rape club."

3.    In approximately 2020, the Federal Bureau of Investigation ("FBI") began an investigation into the constitutional and human rights abuses at FCI Dublin.  Since the inception of the investigation, nine correctional officers ("COs") working for the BOP at FCI Dublin have been convicted of crimes related to the sexual abuse of the female prisoners at the facility. The investigation is ongoing.

4.    Defendant LAWRENCE GACAD ("GACAD") was an agent an employee of the BOP, who started working at FCI Dublin in July of 2021. GACAD took advantage of his position as a CO to prey on the vulnerable, incarcerated women ostensibly under his care.

5.    In August of 2025, GACAD pleaded guilty in federal court to one count of abusive sexual contact due to his misconduct at FCI Dublin. He was sentenced to just 5 years probation, in part because the prosecution only presented one victim.

6.    But GACAD did indeed have at least one other victim: Plaintiff. GACAD sexually abused and harassed Plaintiff over a period of several months.

7.    As a result of Defendants' actions, Plaintiff suffered numerous and substantial emotional, physical, and personal injuries that continue to affect her today, and likely will for the rest of her life.

## JURISDICTION AND VENUE

8.    Plaintiff's claims arise under the United States Constitution, the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), and California statutory and common law.  The Court has federal question jurisdiction over Plaintiff's federal claims, both constitutional and statutory, pursuant to 28 U.S.C. § 1331.  Further, the Court has supplemental jurisdiction over Plaintiff's claims under California law pursuant to 28 U.S.C. § 1367 because these state-law claims arise from a common

nucleus of operative fact with Plaintiff's federal claims.

9. This Court has personal jurisdiction over Defendants. Upon information and belief, all individual Defendants are citizens of, and domiciled in, California. The Court has specific jurisdiction over Defendants because they committed the actions and commissions forming the basis for each claim against them in California.

10. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b). As noted above, Defendants' actions and omissions that give rise to Plaintiff's claims occurred at FCI Dublin, located at 5701 8th St. in Dublin, California, which is within the Northern District of California.

## PARTIES

11. Plaintiff is an individual; she is a citizen of and domiciled in California (currently incarcerated at FCI Victorville). She was incarcerated at FCI Dublin at all times relevant to this action. As a victim of sexual assault as defined by section 115.6 of the Prison Rape Elimination Act ("PREA"), she is using her initials to protect her privacy.

12. GACAD was an individual and citizen of California, as well as an employee of the BOP, at all times relevant to this Complaint. Upon information and belief, GACAD is currently domiciled in Phoenix, Arizona.

13. Defendant United States of America ("the UNITED STATES") is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts of its employees and servants.

14. The UNITED STATES owns, operates, managers, and oversees numerous prisons, including FCI Dublin.

15. Defendant UNITED STATES, acting through its secretary, supervisory employees, employees, agents, and staffs, including those at the BOP, hired individual Defendants GACAD and DOES 1 through 10, inclusive, as

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

employees.

16. While performing the acts and omissions that Plaintiff alleges in this Complaint, GACAD was acting within the scope of their official employment and authority, whether actual or apparent.

17. Plaintiff is ignorant as to the true names, identities, and capacities of Defendants DOES 1 through 10, inclusive. Therefore, Plaintiff sues these Defendants via fictitious names. When the true names, identities, or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will seek leave of this Court to amend the Complaint to assert their true names, identities, and capacities, as well as any specific relevant allegations.

18. Upon information and belief, Defendant DOES 1 through 10, inclusive, were correctional officers ("COs") and/or employees of the UNITED STATES. At all times relevant, these Defendants were acting within the scope of their official employment and authority, whether actual or apparent.

19. Each DOE Defendant is responsible, in some manner, for the events and occurrences delineated in this Complaint, thereby legally causing the injuries and damages to Plaintiff as will be alleged.

20. All Defendants were at all times responsive for the custody, care, control, direction, safety, and wellbeing of Plaintiff.

21. Defendants, and at all times herein mentioned, each was acting within the time, place and scope of employment of other Defendants. At all material times, all of the Defendants aided, abetted, authorized, and ratified all of the actions of all of the other Defendants. Plaintiff is informed and believes, and based thereupon alleges, that at all material times, Defendants, and each of them, were the agents, employees, managing agents, supervisors, coconspirators, parent corporation, joint employers, alter ego, and/or joint ventures of the other Defendants, and each of them, and in doing the things alleged herein, were acting within the course and scope of said agency, employment, conspiracy, joint employer, alter ego status,

and/or joint venture and with the permission and consent of each of the other Defendants. Whenever and wherever reference is made in this Complaint to any act or failure to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly and severally.

## THE PRISON RAPE ELIMINATION ACT

22.    Recognizing the severe problem of rape and sexual assault within correctional institutions, Congress passed the PREA in 2003.  *See* 34 U.S.C. § 30301, *et seq.*   The statute created the National Prison Rape Elimination Commission, which was tasked with establishing national standards for preventing and responding to sexual abuse of inmates.  These standards became effective in August of 2012 and were published in the Federal Register.

23.    PREA regulations are mandatory for all employees of the BOP.  The PREA required the BOP to create and maintain a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment outlining [the BOP's] approach to preventing, detecting, and responding to such conduct. Periodic audits of all federal correctional facilities is required in order to ensure compliance with the standards put forth in the regulations.

24.    The PREA requires that all staff "report immediately" and "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in the facility," as well as any "retaliation against inmates or staff who reported such an incident," as well as any "staff neglect or violation of responsibilities that may have contributed to an incident or regulation." 28 C.F.R. § 115.61. "Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency policy, to make treatment, investigation, and other security and management decisions." *Id.* § 115.61(b).

25.    It further mandates that prison officials assess whether a prison inmate

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

is subject to a substantial risk of imminent sexual abuse, and if it is determined that the substantial risk exists, the prison must take immediate action to protect the inmate. *Id.* § 115.62.

26.    Upon receiving a report of inmate sexual abuse, the facility is required to report it to a designated internal investigator and conduct an administrative or criminal investigation. *Id.* §§ 115.61(e); 115.222(a). A criminal investigation is required for all allegations of inmate sexual abuse, "unless the allegation does not involve potentially criminal behavior." *Id.* § 115.222(b). All such referrals must be documented. *Id.*

27.    Given the high risk for retaliation against a reporter or victim, the BOP is required to "protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff and shall designate which staff members or departments are charged with monitoring retaliation." *Id.* § 115.67(a). A prison's PREA compliance manager must monitor an inmate sexual abuse victim for 90 days after a report of abuse is filed to ensure that he or she is not retaliated against by prison staff. *Id.* § 115.67(a); BOP Program Statement No 5324.11, at 44 (Jan. 6, 2014).

28.    Pursuant to the PREA, all employees of the BOP that have contact with inmates must be trained on the following items: (1) zero-tolerance policy for sexual abuse and sexual harassment; (2) responsibilities regarding detection, reporting, and responding to sexual abuse; (3) inmates' right to be free from sexual abuse and sexual harassment; (4) inmates' and employees' rights to be free from retaliation for reporting sexual abuse or harassment; (5) the dynamics of sexual abuse and sexual harassment in confinement; (6) the common reactions of sexual abuse/assault victims; (7) how to detect and respond to signs of threatened and actual sexual abuse; and (8) how to avoid inappropriate relationships or situations with inmates. *See* 28 C.F.R. § 115.31.

29.    The statute states that presumptive disciplinary sanction for staff that sexually abuses inmates is termination of employment; some form of discipline is required. *Id.* § 115.76.

30.    All documentation relating to an allegation of inmate sexual abuse must be maintained and securely retained for at least ten years after the date of initial collection. *Id.* §§ 115.87(a), (d); 115.89(a), (d).

31.    The PREA also requires the BOP to offer medical and mental health care to all sexual abuse victims.  *Id.* § 115.83.

### THE CULTURE OF SEXUAL ABUSE AT FCI Dublin

32.    Based on information and belief, throughout the last three decades, the UNITED STATES has repeatedly ignored incidents of sexual misconduct at FCI Dublin.

33.    Despite the long-established requirements of the PREA, personnel at FCI Dublin engaged for years in a pattern and practice of engaging in sexual abuse of inmates and then covering it up.

34.    FCI Dublin had an institutional culture of defiance of the PREA.  COs regularly turned a blind eye towards rampant sexual assault and abuse of female inmates.  The culture prioritized loyalty to fellow COs over the duty under the PREA to prevent sexual assault and assist victims.  Inmates who spoke out were regularly retaliated against, also in violation of the PREA.

35.    This culture first became entrenched during the period between December 2018 and November 2020, when Ray J. Garcia was the associate warden at FCI Dublin. Garcia was promoted to the position of warden of FCI Dublin in November 2020; he remained warden until July 2021.

36.    As the warden, Garcia was responsible for the safekeeping, care, protection, discipline, programming, health, employment, and release of inmates incarcerated at FCI Dublin.  Garcia was also responsible for hiring, training, supervising, and managing staff.  He had disciplinary authority over all employees

working at FCI Dublin as well as all inmates incarcerated there. Garcia was further in charge of determining, enacting, and employing operating procedures and policies for FCI Dublin. Crucially, Garcia was in charge of ensuring PREA compliance and conducting the annual PREA audit.

37. Garcia failed to comply with the PREA throughout his tenure at FCI Dublin. He failed provide sufficient or effective training to the COs, staff, and independent contractors working with female inmates. He further failed to conduct adequate and accurate audits of the facility, because he was very aware that he himself, along with many others working at FCI Dublin, was personally engaging in sexual abuse of the incarcerated women. Garcia also, as part of his purposeful coverup of the epidemic of sexual abuse at the prison, failed to properly respond to or investigate complaints and/or allegations of sexual assault that he received as warden.

38. Garcia sexually assaulted multiple women under his care. He groped women, forced them to pose nude, and verbally degraded them. Garcia even continued to sexually harass women once they had been sent to BOP-controlled halfway houses, sending pictures of his penis to one. He intentionally used his power as warden to take advantage of his victims, promising them preferential treatment if they complied with his demands.

39. In September of 2021, Garcia was indicted for multiple counts of federal felony sexual abuse of a ward, based on sexually assaulting inmates and having naked photographs of inmates on his government-issued cell phone. He was convicted by a jury trial in March of 2023. When sentencing him to 70 months, the U.S. District Judge Yvonne Gonzalez Rogers declared that FCI Dublin was a "cesspool" and that Garcia not only "did nothing about it," but actually "went along with the ride and enjoyed the cesspool [him]self."

40. Garcia's sexual misconduct was known to others at FCI Dublin, and it set an example that COs and other staff could get away with abusing the inmates.

Garcia modeled poor behavior, and he intentionally ignored other employees' acts of sexual abuse that he either knew of or should have known about. Individuals working at FCI Dublin knew, through observing Garcia's conduct, that sexual abuse of women was acceptable and would not be punished. Thus, Garcia ratified the illegal conduct of his inferior officers.

41.    In addition to Garcia and GACAD, least seven other BOP employees have been convicted of charges related to their sexual abuse of female inmates at FCI Dublin. While the investigation remains ongoing, the following individuals have been charged:

(a)    CO Ross Klinger pleaded guilty to sexual abuse of a ward in February of 2022;

(b)    Chaplain James Highhouse pleaded guilty in February of 2022 and was sentenced to 84 months custody;

(c)    CO Enrique Chavez pleaded guilty in October of 2022 and was sentenced to 20 months prison;

(d)    CO John Bellhouse CO John Bellhouse was convicted by a jury in June of 2023 and sentenced to 63 months prison;

(e)    CO Nakie Nunley pleaded guilty in July of 2023 and was sentenced to 72 months prison;

(f)    CO Andrew Jones pleaded guilty in August of 2023 and was sentenced to 96 months prison; and

(g)    CO Jeffrey Wilson pleaded guilty in August of 2025 and faces sentencing in February of 2026.

42.    Upon information and belief, many more COs, staff, and contractors engaged in sexual abuse of women, even though they have not been indicted or convicted.

43.    Despite the FBI investigation and the removal of many COs accused of sexual abuse, predators remained at FCI Dublin. As a result of the many COs

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

getting arrested, placed on leave, or transferred, the remaining COs were resentful and angry toward the women who they believed "snitched" on their coworkers. The COs began engaging in retaliatory behavior against the women, including but not limited to locking women in special housing units for solitary confinement, transferring them away from their families, giving them disciplinary "shots" that affected their good time credits, and conducting random, baseless searches during which they would violently tear up the women's property.

44.     As the scandal gained more media attention, U.S. Senate conducted a bipartisan investigation into sexual abuse of female prisoners in BOP custody. In December of 2022, the U.S. Senate Permanent Committee on Investigations, Committee on Homeland Security and Government Affairs released their final report.

45.     The United States Senate's bipartisan investigation into sexual abuse of female prisoners in BOP custody found that BOP employees have sexually abused female prisoners in at least two-thirds of facilities that have held women over the last decade.[1]   It additionally noted that BOP management failures and seriously flawed investigative practices are both to blame for this terrible failure to successfully implement the Prison Rape Elimination Act (PREA).[2] The BOP also failed to hold employees accountable for their misconduct, with "a backlog of approximately 8,000 internal affairs cases alleging employee misconduct, some of which have been pending for more than five years."[3]

---

[1] U.S. Senate Permanent Subcommittee on Investigations, *Sexual Abuse of Female Inmates in Federal Prisons*, at 4 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf [hereinafter, Senate Report], at 1.

[2] *Id.*

[3] *Id.* at 4.

46. The report also pointed out the inadequacy of the PREA audits in detecting or preventing sexual assaults of inmates. It noted that FCI Dublin's PREA audits all came back clean, despite the known sexual misconduct that the guards were engaging in during that time period. It asserted that FCI Dublin had a recurring problem of sexual abuse of female prisoners, and that there was evidence that problem had been ongoing since the 1990s. It concluded that the BOP had failed to take agency-wide action to address the problem.

47. In August of 2023, a class action lawsuit was filed against the BOP and FCI Dublin officials. *See California Coalition for Women's Prisoners et al. v. United States et al.*, No. 4:23-cv-4155-YGR (N.D. Cal.). A Special Master was appointed to oversee FCI Dublin.

48. Shortly thereafter, in April of 2024, the BOP shut down FCI Dublin. *See id.* (ECF No. 300, at 1). Then-Director of the BOP Colette S. Peters acknowledged that the facility was "not meeting expected standards" despite the fact that the BOP had taken "unprecedented steps and provided a tremendous amount to address culture, recruitment and retention, aging infrastructure – and most critical – employee misconduct."[4]

49. On June 5, 2024, the Special Master issued her first report regarding FCI Dublin, finding that it had "a cascade of failure in critical institutional systems and areas."[5] The report, among other things, highlighted the prison's significant problems with inadequate mental health treatment, discipline and due process, and inadequate PREA protocol.[6] The Special Master stated that it was "unconscionable

---

[4] Lisa Fernandez, *FCI Dublin Closing, Women Transferred to Prisons Across U.S.*, KUTV (Apr. 16, 2024), https://www.ktvu.com/news/fci-dublin-closing-women-transferred-elsewhere.

[5] Wendy Still, First Report of the Special Master Pursuant to the Court's Order of March 26, 2024 (Jun. 5, 2024), at 28; https://s3.documentcloud.org/documents/25030691/fci-dublin-special-master-report.pdf

[6] *Id.*

that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin for such an extended period of time without correction."[7]

## GACAD'S SEXUAL ABUSE OF PLAINTIFF

50. Plaintiff began her sentence at FCI Dublin in early 2021.

51. As soon as she arrived at FCI Dublin, Plaintiff realized the environment was rife with cruelty, sexual misconduct, and corruption.

52. Frequently, the COs would make sexual comments to women, inquiring and speculating about their sex lives, or assessing and praising their bodies. COs would walk in on women while they were in the shower and leer at their naked bodies, just to show that they could. COs would enter women's cells without any reasonable suspicion and conduct pat-downs and strip searches, under the pretext of a minor infraction.

53. The COs were frequently degrading to the women, verbally abusing them. It was not uncommon for the COs to fly into a fit of rage and destroy the women's property.

54. Further, many of the COs had sexual contact with women at the prison. Plaintiff would see officers who repeatedly pulled the same woman out of her cell and took her to a private room. Inmates would openly discuss sexual and romantic relationships between the women and COs. They would also warn each other about which guards were particularly lecherous and abusive.

55. Plaintiff was given the opportunity to work in the kitchen, and she noticed that many of the women working there had sexual relationships with COs. For instance, two of the cooks were romantically and sexually involved with CO Andrew Jones (who was later convicted of sexual abuse of FCI Dublin inmates). COs working in the kitchen regularly used their disciplinary power and their access

---

[7] *Id.* at 13.

to food as a way to induce women into sexual activity.

56. Because these actions were well known to all the inmates at FCI Dublin, they lived in a daily atmosphere of fear. Though some women reported what happened, their complaints would be ignored. Other women did not even attempt to complain, as the COs had threatened them and warned them that nobody would believe the word of an inmate against a guard.

57. It was common that women who accused COs of sexual abuse would be sent to the Special Housing Unit ("SHU"), which was similar to solitary confinement. Plaintiff witnessed this happen to two victims who reported their abusers; the women were kept in the SHU for over a month.

58. GACAD began working at FCI Dublin at the very end of Warden Garcia's tenure, overlapping with him slightly.

59. Upon information and belief, GACAD was aware that many COs at FCI Dublin, including Warden Garcia, were involved in sexually abusing female inmates. Even after Warden Garcia was removed, sexual abuse and harassment was still occurring at the prison.

60. GACAD sometimes worked in the unit where Plaintiff lived. She first encountered him in her unit.

61. Plaintiff was aware through prison gossip that GACAD was having a sexual relationship with a woman in another unit. The women at FCI Dublin would all talk about which guards were "sleazy." For that reason, Plaintiff felt nervous when she interacted with him.

62. On one occasion, GACAD searched Plaintiff's cell and found some contraband food items she had taken from the kitchen. Plaintiff knew that under FCI Dublin policy, GACAD was supposed to confiscate the food and issue her a disciplinary write-up.

63. GACAD allowed Plaintiff to keep the contraband food, but told her that she was going to "owe" him for letting the infraction slide. From then on, he

began treating her differently. Plaintiff was frightened by this implied threat of sexual abuse, and she spent the next few days worrying about GACAD.

64.    A few days later, GACAD came to her room again, ostensibly for the purpose of a search.

65.    This time, GACAD was blatantly sexual with Plaintiff. He asked what color her nipples were, then he groped her breasts. He put his hands between her legs and began rubbing her vulva over her clothing.

66.    This became a pattern—GACAD began calling her out for search on a regular basis, with far more frequency than she had previously experienced during her incarceration. He would sometimes do it when she came back from dinner or after she was required to pick up the geese feces that littered the grounds of FCI Dublin.

67.    In all, GACAD came to Plaintiff's cell approximately 10 times to conduct a "search" that was really an excuse to initiate sexual contact.

68.    Plaintiff performed oral sex on GACAD multiple times. She also had anal sex with him on one occasion; GACAD wanted to have vaginal sex but she was afraid of getting pregnant so asked him to please not penetrate her vagina.

69.    Plaintiff was initially frightened by GACAD's attention, but over these many sexual interactions, she began to have romantic feelings for him. Even though she knew that what was happening was wrong, she felt attached to him.

70.    Plaintiff began to feel jealous of GACAD's sexual relationship with the woman in the other unit. Over time, GACAD began spending more time with the other woman and less time with Plaintiff. Although she felt ashamed of her feelings, Plaintiff told GACAD that she felt hurt and neglected.

71.    When Plaintiff was sent to the SHU due to an altercation with another inmate, she told GACAD's superior, Lieutenant Putnam, that GACAD was having a sexual relationship with an inmate. She was motivated by jealousy and the desire to end GACAD's relationship with the other woman. Plaintiff did not tell Putnam

that she herself was also having sex with GACAD.

72. Putnam did not appear surprised or concerned when he received the report about GACAD. He did not follow the protocol for reports of staff-on-inmate sexual abuse.

73. Instead, Putnam told Plaintiff that he would investigate GACAD only if Plaintiff provided assisted Putnam in his investigation into illegal drugs (specifically, a drug called "K2") at the facility.

74. Feeling pressured, Plaintiff agreed to try and help out. But Plaintiff never had any information to provide Putnam.

75. Putnam never followed up with Plaintiff to ask any further information about GACAD's sexual misconduct.

76. GACAD came to Plaintiff's cell once after she got out of the SHU, but his demeanor was different. Instead of initiating sex, he came to threaten her. GACAD told her to "be careful," because he had the power to take her "good time" credits away, which would have resulted in her spending more time in custody.

77. Plaintiff suspected that Putnam had told GACAD about her report. She knew that GACAD was threatening to retaliate against her if she spoke out any further about him.

78. Plaintiff did not want to risk losing her good time. From that point on, she did her best to stay away from GACAD, and she kept quiet about the abuse she had suffered.

**FTCA ADMINISTRATIVE EXHAUSTION AND EQUITABLE TOLLING**

79. This action is, at least in part, brought pursuant to the FTCA, which provides that a tort claim against the UNITED STATES will be forever barred "unless it is presented in writing to appropriate Federal agency within two years after such claim accrues or unless action is begun with six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

80. As described herein, Plaintiff was subjected to repeated sexual abuse by a BOP employee.

81. During her incarceration, Plaintiff was threatened, intimidated, and retaliated against by correctional officers. These officers had the ability to send her to solitary confinement in the SHU, to prevent her from purchasing food and toiletries, to take away her privileges to communicate with her family, and to extend her sentence by denying her "good time" credit.

82. GACAD in particular subjected Plaintiff to threats, resulting in a serious fear that he would retaliate against her if she reported his sexual abuse.

83. During Plaintiff's incarceration at FCI Dublin, she witnessed other women being held in the SHU for long periods after they had reported sexual abuse by a CO. Plaintiff was scared that the same thing would happen to her.

84. Plaintiff felt like she was a target while at FCI Dublin, and this did not change when she left. When she first left FCI Dublin, she was still in BOP custody at a residential reentry center ("RRC"), and thus totally under the control of the UNITED STATES.

85. RRCs house both inmates who are still technically finishing their custodial sentence as well as former inmates who are on supervised release. Although RRCs typically have private management, the BOP has extensive power over them. On multiple occasions, Dublin victims living at RRCs have faced discipline or been treated differently than other residents, simply because of their status as "Dublin women" or their participation in the lawsuit. For example, the BOP has delayed completing paperwork that Dublin victims have needed in order to transfer from the RRC to home confinement. In another example, a Dublin victim gave an interview about her participation in a lawsuit against the UNITED STATES. The BOP directed the RRC to discipline her for allowing the journalist to come onto the RRC property, and she was threatened with a return to custody.

86. After leaving the RRC, Plaintiff was on supervised release and so still

under the supervision of the UNITED STATES, in the form of the U.S. Probation Office. The UNITED STATES thus continued to dictate Plaintiff's movements, restrict her liberty, monitor her activities, and subject her to sanctions.

87.    Plaintiff was unaware that GACAD had stopped working for the BOP. While on supervised release, Plaintiff was in constant fear that her supervised release would be revoked and she would be sent back into BOP custody, where she might again be subjected to abuse by GACAD.

88.    Plaintiff's fear of revocation was well founded, as studies have shown that approximately 25% of defendants given a term of supervised release will have it revoked within 3 years, whether due to new criminal conduct or simply a technical violation.[8] These revocations result a return to BOP custody for an average of 8–21 months, depending on the severity of the violation.[9]

89.    Plaintiff in fact did return to BOP custody. Due to the extensive trauma she suffered while at FCI Dublin, Plaintiff's mental health was extremely poor while on supervised release. She suffered from symptoms of anxiety, depression, PTSD, and she eventually relapsed into substance use disorder. Her relapse led to the revocation of her supervised release.

90.    In September of 2025, Plaintiff was sentenced to 9 months in custody for the violation of her supervised release. She is set to be released from custody on March 31, 2026, at which time she will begin another term of supervised release lasting 32 months.

91.    Thus, Plaintiff has been under the direct control and/or supervision of the UNITED STATES at all times since her release from FCI Dublin.

---

[8] James L. Johnson, *Federal Post-Conviction Supervision Outcomes: Rearrests and Revocations*, 87 FED. PROBATION J. (Sept. 2023), at 7, https://www.uscourts.gov/file/78377/download.

[9] U.S. Sent'g Comm'n, *Federal Probation and Supervised Release Violations* (Jul. 2020), at 35, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200728_Violations.pdf.

92. The constant abuse, threats, and intimidation at FCI Dublin made it impossible for Plaintiff to report her claims or pursue her legal rights while incarcerated.

93. Even after her release, the threats made against Plaintiff and the UNITED STATES' continued control and authority over her continued to render her incapable of seeking relief.

94. Additionally, Plaintiff's severe symptoms of anxiety, depression, PTSD, and substance use disorder interfered with her ability to file her claim within two years of the abuse.

95. On January 4, 2026, while still in BOP custody, Plaintiff submitted her "Claim for Damage, Injury, or Death" to the UNITED STATES. The Claim was in the amount of $,000,000.

96. The BOP acknowledged receipt of Plaintiff's claims on January 20, 2026. It then rejected the claim on February 27, 2026.

97. Plaintiff's FTCA claim should be considered timely filed given that Plaintiff has been either in custody or on supervised release at all times, and thus remained under the control of the UNITED STATES. Supervised release imposed continuing restrictions on Plaintiff's liberties, subjected her to supervision and sanction, and perpetuated the same coercive conditions of control and fear of retaliation that prevented her from asserting her claim earlier.

98. Alternatively, Plaintiff is entitled to equitable tolling for this claim. The United States Supreme Court determined the FTCA's statute of limitations is non-jurisdictional and subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 420 (2015). Equitable tolling applies when (1) a plaintiff pursued her rights diligently, and (2) extraordinary circumstances prevented timely filing. *Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013).

99. Courts have recognized that survivors of sexual abuse may be entitled to equitable tolling where trauma, fear, and coercion prevented timely filing. *See*

*e.g.*, Order granting in Part and Denying in Part Motion to Dismiss at 1, *Su v. United States*, No. 4:25-cv-00329-YGR (N.D. Cal. Sept. 3, 2025), ECF No. 24.; *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (equitable tolling appropriate where sexual abuse and resulting post-traumatic stress disorder rendered plaintiff unable to timely pursue claims.).

100. Plaintiff faced extraordinary circumstances which prevented the timely filing of her FTCA claim.

101. Because Plaintiff was in custody and/or on supervised release throughout the the statute of limitations period, she continued to experience extraordinary circumstances that prevented her from freely accessing the courts or safely pursuing her claims. While Plaintiff remained under the supervision and control of the UNITED STATES with the threat of a return to BOP custody constantly hanging over her head, the threats and coercion that silenced her persisted in impeding her pursuit of justice.

102. Additionally, the prolonged sexual abuse, repeated threats, retaliation by COs, and lasting psychological effects of the substantial sexual abuse made it impossible for her to assert her rights within the usual statutory deadline.

103. Thus, Plaintiff acted diligently under these circumstances.

104. In February 2022, U.S. Representative Jackie Speier went to FCI Dublin to further investigate the potential abuse occurring by BOP and BOP employees. Representative Speier was prevented from speaking with several inmates who had reported abuse and was instead directed to speak only with staff members.[10] This restriction of access to incarcerated survivors of sexual abuse further demonstrated a deliberate effort by FCI Dublin and the BOP to obstruct independent oversight and investigation. This was a continued pattern of cover-up

---

[10] Associated Press, *Whistleblowers Say They're Bullied for Exposing Prison Abuse*, COLUMBIAN (February 24, 2022), https://www.columbian.com/news/2022/feb/24/whistleblowers-say-theyre-bullied-for-exposing-prison-abuse/.

and suppression of reports of abuse at the facility.

105. A court-appointed Special Master has confirmed that during the time of Plaintiff's incarceration, "there was no safe or consistent path women could take to file sex abuse complaints," that women were "intimidated and forced to justify why they needed to complete [PREA] forms in the first place," and that women who tried to report abuse were met with retaliation, including solitary confinement and wrongful disciplinary infractions that extended their incarceration.[11]

106. Judge Yvonne Gonzalez Rogers found "shocking constitutional violations" at FCI Dublin, including systemic failures by the BOP that intentionally disregarded inmates' rights for years despite being fully aware of ongoing abuse or retaliation.[12]

107. These wrongful acts and omissions by The United States and Defendants created an environment in which it was impossible for Plaintiff to assert her rights. The extraordinary circumstances of continuing probation, prolonged sexual abuse, coercion, intimidation, and post-traumatic harm directly prevented Plaintiff from pursuing her claim.

108. Defendants are not entitled to benefit from their own misconduct. Equitable tolling of Plaintiff's statute of limitation prevents this very result. Without the equitable tolling of Plaintiff's statute of limitation Defendants would be rewarded for the very intimidation, retaliation, and constitutional violations that

---

[11] Lisa Fernandez, *FCI Dublin Special Master Finds 'Cascade Failures at Women's Prison*, KTVU (Aug. 20, 2024), https://www.ktvu.com/news/fci-dublin-special-master-finds-cascade-failures-womens-prison; Lisa Fernandez, *Special Master Issues 1st Report on FCI Dublin Sex Assault*, KTVU (Aug. 19, 2024), https://www.ktvu.com/news/special-master-issues-1st-report-fci-dublin-sex-assault; Lisa Fernandez, *FCI Dublin Special Master Authorized to Ensure Women Care for at Other Prisons: Judge*, KTVU (May 21, 2024), https://www.ktvu.com/news/fci-dublin-special-master-authorized-to-ensure-women-cared-for-at-other-prisons-judge.

[12] Lisa Fernandez, *"Shocking" Constitutional Violation at Now-Closed FCI Dublin: Judge*, KTVU (May 7, 2024), https://www.ktvu.com/news/judge-cites-shocking-constitutional-violations-now-closed-fci-dublin.

prevented Plaintiff from asserting her claim within the statutory period.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## *BIVENS* CLAIM — VIOLATION OF THE EIGHTH AMENDMENT

## CRUEL AND UNUSUAL PUNISHMENT

## SEXUAL ABUSE, DELIBERATE INDIFFERENCE TO PLAINTIFF'S

## SAFETY, AND FAILURE TO PROTECT

## U.S. Const. Amdt. VIII

## (Against Defendants GACAD and DOES 1–10, inclusive)

109.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

110.   This constitutional claim is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

111.   The Eighth Amendment of the United States Constitution guarantees Plaintiff the right to be free from cruel and unusual punishment.  Sexual abuse of a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment, as it serves no legitimate penological purpose.

112.   Federal law recognizes that an inmate cannot legally consent to sexual contact, harassment, or abuse from a prison guard.  This is because the power difference between inmates and guards is so extreme that it negates any ability to consent.  Even sexual contact that would be considered consensual in other circumstances is not consensual in the context of an inmate.  Plaintiff did not consent to any of the sexual contact between her and GACAD.

113.   The actions of GACAD deprived Plaintiff of her Eighth Amendment rights.

114.   The UNITED STATES failed to supervise and train FCI Dublin COs to prevent sexual abuse, despite being aware of the "rape club" culture at the prison.  Garcia and other supervisory employees ratified the conduct of GACAD and other

COs engaged in sexual abuse of inmates by personally participating in the same conduct.  The UNITED STATES also failed to comply with its duties under the PREA to help detect and prevent sexual abuse.

115.   Defendants' actions and omissions created a substantial risk of serious harm to female inmates like Plaintiff.  Due to their PREA training, Defendants were aware of that substantial risk, and yet they failed to take reasonable measures to abate the risk. In fact, they were deliberately indifferent to that risk by consciously choosing to disregard their duties under federal law.

116.   GACAD violated Plaintiff's right to be free from cruel and unusual punishment when he made nonconsensual, offensive sexual contact with Plaintiff and engaged in sexual conduct for his own sexual gratification and for the purpose of humiliating, degrading, or demeaning Plaintiff.  At the time, she was an incarcerated inmate at FCI Dublin and he was a CO with substantial power over her, thus the sexual abuse occurred under coercive circumstances.

117.   By intentionally subjecting Plaintiff to sexual acts, GACAD acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

118.   GACAD acted under color of federal law, in that he was acting or purporting to act in the performance of their official duties as BOP employees.

119.   Plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide a meaningful remedy; thus, an appropriate remedy, namely damages, can be imposed by this Court.

120.   As a direct and legal result of the aforementioned acts and omissions of the Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

121.   Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

122.   The conduct of GACAD and DOES 1 through 10 was willful, wanton,

malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

## SECOND CAUSE OF ACTION

### GENDER VIOLENCE

### Cal. Civ. Code § 52.4

### (Against Defendant GACAD and DOES 1–10, inclusive)

123. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

124. At all relevant times mentioned in this Complaint, California Civil Code § 52.4 was in full force and effect and was binding on GACAD. Under that statute, any person subjected to gender violence may bring a civil action for damages against the responsible party. Gender violence is a form of sex discrimination that includes a physical intrusion or invasion of a sexual nature under coercive conditions.

125. GACAD committed a physical intrusion and/or physical invasion of a sexual nature against Plaintiff under coercive conditions. Specifically, he groped and had oral and anal sex with Plaintiff.

126. GACAD also committed against Plaintiff a criminal offense that has an element of the use, attempted use, or threatened use of physical force against the person of another.

127. GACAD committed these acts against Plaintiff at least in part because of her gender.

128. GACAD's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

129. As a direct and legal result of the aforementioned acts and omissions of GACAD, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other

economic and non-economic damages in an amount not yet ascertained.

130. Plaintiff also asserts this claim against DOES 1 through 10, inclusive

131. The conduct of GACAD and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

132. Plaintiff further seeks attorneys' fees and costs, as expressly authorized by the statute.

**THIRD CAUSE OF ACTION**

**SEXUAL BATTERY**

**FTCA; Cal. Civ. Code § 1708.5**

**(Against All Defendants)**

133. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

134. Plaintiff brings this claim for sexual assault under FTCA and California Civil Code § 1708.5 against the UNITED STATES and GACAD. The UNITED STATES ratified the conduct of GACAD. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

135. GACAD acted with the intent to cause a harmful or offensive contact with Plaintiff's breasts, buttocks, vulva, vagina, and anus, and a sexually offensive contact resulted. GACAD further acted with the intent to cause a harmful or offensive contact between his penis and Plaintiff's mouth and anus, and a sexually offensive contact resulted.

136. GACAD also acted with intent to cause an imminent apprehension of sexual assault, and sexually offensive contact with Plaintiff resulted.

137. GACAD's offensive contact would offend a reasonable sense of personal dignity and lacked any penological justification.

138. GACAD's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

139. As a direct and legal result of the aforementioned acts and omissions of GACAD, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

140. These allegations are also asserted against DOES 1–10, inclusive.

141. The conduct of GACAD and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

142. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**FTCA; California Common Law**

**(Against All Defendants)**

143. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

144. Plaintiff brings this claim for intentional infliction of emotional distress under FTCA and California common law against the UNITED STATES and GACAD. The UNITED STATES ratified the conduct of GACAD. Pursuant to

25

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

145.   GACAD engaged in willful misconduct that was outrageous and offensive.

146.   GACAD intended to cause and/or acted with reckless disregard of causing severe emotional distress to Plaintiff.

147.   As a direct and legal result of the aforementioned willful misconduct of GACAD Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

148.   Plaintiff also brings this claim against DOES 1 through 10, inclusive.

149.   The conduct of GACAD and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

150.   This action arises out of the commission of a felony.  Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FIFTH CAUSE OF ACTION**

**BATTERY**

**FTCA; California Common Law**

**(Against All Defendants)**

151.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

152. Plaintiff brings this claim for intentional infliction of emotional distress under FTCA and California common law against the UNITED STATES and GACAD. The UNITED STATES ratified the conduct of GACAD. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

153. GACAD touched Plaintiff and/or caused Plaintiff to be touched with the intent to harm or offend her by sexually abusing while she was incarcerated at FCI Dublin.

154. Plaintiff did not consent to the touching. As an inmate at a correctional facility, she could not legally consent. The touching had no legitimate penological purpose.

155. Plaintiff was harmed and offended by GACAD's conduct, and a reasonable person in Plaintiff's situation would also have been offended by the touching.

156. As a direct and legal result of the aforementioned acts and omissions of GACAD, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

157. Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

158. The conduct of GACAD and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

159. This action arises out of the commission of a felony. Plaintiff is

therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

### FTCA; California Common Law

### (Against All Defendants)

160. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

161. Plaintiff brings this claim against the UNITED STATES, GACAD, and DOES 1–10 under the FTCA and California common law based on the actions and/or omissions of UNITED STATES, GACAD, and DOES 1–10 taken while working at FCI Dublin in their capacities as employees of the BOP and acting within the scope of their employment, with the permission and consent of the UNITED STATES.

162. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

163. Because she was an inmate at a federal prison run by the BOP, Plaintiff was at all relevant times in the custody and care of the UNITED STATES.

164. Because of the special relationship between a jailer and prisoner, the UNITED STATES, including its employees GACAD and DOES 1–10, inclusive, had a general duty and common law duty of care under California law to protect Plaintiff from foreseeable harm, including but not limited to sexual assault,

harassment, and abuse.

165.   Sexual assault, harassment, and abuse of female inmate by male COs was a foreseeable harm of which the UNITED STATES was aware.  The BOP was specifically aware of the risk to female inmates based not only on the PREA, but on its knowledge of prior incidents of sexual assault of female inmates in the 1990s and 2000s. California negligence law does not require the UNITED STATES to have had actual knowledge of GACAD's abuse of Plaintiff, but nevertheless, the UNITED STATES knew or should have known of what GACAD was doing because of the widespread prison rumors about him and multiple female inmates, as well as his flagrant behavior in making sexual comments to Plaintiff and visiting her cell without penological justification. GACAD's sexual abuse of Plaintiff was reasonably foreseeable to the UNITED STATES because GACAD's conduct made it obvious he was sexually abusing Plaintiff.

166.   The BOP's Personal Conduct rules for staff disallow any sexual activity with an inmate and state that an employee may not allow another person to engage in such behavior. It explicitly states that there is no such thing as consensual sex between staff and inmates.

167.   Further, Defendants had additional mandatory statutory duties of care to Plaintiff based on PREA regulations and BOP policy to protect Plaintiff from the known risk of sexual assault, harassment, and abuse.  These duties required it to provide proper training and supervision of COs and to properly investigate allegations of sexual abuse.

168.   The UNITED STATES breached these duties in a variety of ways. It failed to supervised and operated FCI Dublin in a manner that would have prevented GACAD's ongoing sexual abuse and harassment of Plaintiff. The UNITED STATES did not take reasonable, available measures to abate the risk of abuse to Plaintiff and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison

operations, including adequately monitoring work programming and correctional officer assignments.

169. The BOP as an agency failed to properly monitor, assess, and address its widespread problem with female inmates being sexual assaulted, especially at prisons with recurring issues like FCI Dublin. It failed to sufficiently train supervisory FCI Dublin employees such as those who supervised GACAD. It also lacked an effective system for checking to ensure the validity of PREA audits, instead allowing an abusive warden to falsify his report for multiple years, without any knowledge of the BOP. It further failed to provide sufficient security measures at FCI Dublin, including but not limited to adequate security camera coverage to eliminate unmonitored areas that provided a safe haven for perpetrators. The BOP also failed to take adequate steps to address complaints of misconduct, resulting in a backlog of thousands of complaints, and it failed to sufficiently analyze those complaints in order to detect patterns of misconduct by prisons or officers. It failed to properly screen potential employees, failing to research the backgrounds, histories, qualifications, and competence of COs that were hired. And the BOP further failed to properly discipline and terminate COs who engaged in misconduct and retaliation against those who spoke out against misconduct. Instead, it made reckless and dangerous decisions to transfer those COs to a new unit or even new prison—thus giving them the opportunity to find a new set of victims.

170. GACAD's sexual abuse and harassment of Plaintiff occurred as the direct and proximate result of the supervisory negligence of the UNITED STATES and DOES 1–10.

171. As a direct and legal result of the aforementioned negligence of the UNITED STATES and DOES 1–10, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

## **SEVENTH CAUSE OF ACTION**

**BANE ACT**

**FTCA; Cal. Civ. Code § 52.1**

**(Against All Defendants)**

172.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

173.   Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

174.   Under Cal. Civil Code §52.1, it is a civil rights violation for any person to interfere with the exercise or enjoyment by an individual of her rights secured by the U.S. Constitution or state or federal law.  This includes any interference with these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

175.   GACAD interfered with Plaintiff's rights to protection from bodily restraint, harm, and insult, as secured by California Civil Code § 43; her rights under the California Constitution to be free of the imposition of punishment without due process, cruel and unusual punishment, and the right to be free from sexual violation; and her right under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment. He interfered with these rights by threat, intimidation, and/or coercion.

176.   Plaintiff also brings this claim against DOES 1–10, inclusive.

177.   As a direct and legal result of the aforementioned conduct of GACAD,

Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

178. Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 52.1.

**EIGHTH CAUSE OF ACTION**

**TRAFFICKING VICTIMS PROTECTION ACT**

**18 U.S.C. § 1581, *et seq.***

**(Against All Defendants)**

179. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

180. Defendant GACAD knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her.

181. Defendant GACAD sexually abused Plaintiff through force and/or coercion.

182. Plaintiff also brings this claim against DOES 1–10, inclusive.

183. As a direct and legal result of the aforementioned acts and omissions of Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained. She thus has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

**NINTH CLAIM FOR RELIEF**

**CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT**

**FTCA; Cal. Civ. Code § 52.5**

**(Against All Defendants)**

184. Plaintiff incorporates by reference all previous paragraphs as if fully

32

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

stated herein.

185. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant GACAD.

186. Defendant GACAD knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her.

187. Defendant GACAD sexually abused Plaintiff through force and/or coercion.

188. Plaintiff also brings this claim against DOES 1–10, inclusive.

189. As a direct and legal result of the aforementioned acts and omissions of Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

## PRAYER FOR RELIEF

Plaintiff S.O. prays for judgment as follows:

1) For compensatory, general, and special damages, including past, present, and future damages, in an amount in accordance to proof;

2) For punitive damages as permitted by law;

3) For reasonable costs, attorneys' fees, and litigation expenses, including expert witness fees, as permitted by law; and

4) For any other relief that is just and proper.

## DEMAND FOR JURY TRIAL

33

Plaintiff demands a jury trial on all claims so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

Date:  March 17, 2026

/s/ *Alana L. McMains*
**Alana L. McMains**
**MCMAINS LAW, APC**
Attorney for Plaintiff